[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Plaintiff and defendant married in Windsor, Connecticut, on February 29, 1972, approximately nineteen years ago. It was his second marriage, her first. He is now fifty-four years of age, she is forty-four. They have each resided in this state for the past twelve months. Neither are recipients of public assistance from the State of Connecticut or of any governmental subdivision. They each testify that their marriage has broken down irretrievably.
Two children have been born to them: Elizabeth L. Fricke, CT Page 1200 born September 26, 1974, now sixteen years of age, and Ashley M. Fricke, born February 7, 1980, now eleven years of age.
The focus of this disputed dissolution has been each party's conviction that the irretrievable breakdown of the marriage is a result of the other's fault. Husband points to Susan Fricke's relationship with Thomas Hupp, with regard to which both Susan Fricke and Thomas Hupp invoked the Fifth Amendment whenever questioned about it. Noel Fricke asks the court to adopt an adverse inference based upon the testimony produced at the trial. And this court does so, finding that Susan Fricke and Thomas Hupp had an adulterous relationship.
Such an adverse inference, however, is not the equivalent of a finding that the irretrievable breakdown of the Fricke marriage was caused by that adulterous relationship. To the contrary, this court finds that the liaison between Susan Fricke and Thomas Hupp was the result of the irretrievable breakdown of the Fricke marriage and reflects years of previous dissonance.
While focusing on the issue of adultery within this marriage, the court notes that Noel Fricke engaged in an admittedly adulterous relationship with Susan while he was still married to his first wife. Mindy Hupp, Thomas Hupp's outraged wife, who was called as a witness by Noel Fricke and who spoke of her anger towards her adulterous husband, admitted an adulterous relationship with that Thomas Hupp before her divorce from her first husband. Adultery is clearly not an aberation in Fricke or Hupp interactions.
Susan Fricke points to the marital behavior of her husband, Noel, claiming that his historically harsh and controlling behavior destroyed her affection for him. She points to his intractible behavior during therapy as evidence of the impossibility of working towards a mutually loving relationship with him. Noel Fricke confirmed Susan's despair by testifying the he never told her he was unwilling to change. What he told her, he said, was that she would have to come to grips with who he was, and that he would be willing to work with her in therapy to help her get used to that. That attitude guaranteed therapy would be an empty process for Susan. Yet Noel Fricke testified to being shocked when Susan rejected his condition of an additional fifty-two weeks of such therapy as his price for moving out of the family home. When Susan refused, Noel similarly refused and Susan and the children were compelled to move into a two bedroom condominium while Noel lived alone in the family's nine room home.
Clearly, each of the spouses made direct contributions to CT Page 1201 the breakdown of their marriage. Their contributions differed chronologically and differed in kind — but neither of them was solely at fault. They each behaved in ways that damaged their relationship, but neither of them deserves to be scarred with the sole blame for the breakdown of that relationship.
Noel Fricke spoke, with what seemed at first to be bewilderment but what emerged later as scorn, of his wife's sensitivity: "She's intimidated by the look on my face, the manner of my speech, my size. She's intimidated by a butterfly's wings too close to her face."
Susan Fricke spoke of public and private humiliations, her husband's abusive behavior, his depression, the financial strain of living beyond their means, his reverence for golf, the futility of their counseling, his country clubs and the rising family debt, their mutual alcoholism — which she abated in 1982 and Noel abated in 1985, and her conviction that this contested trial was calculated to punish and humiliate her for defying Noel by pursuing her divorce.
Noel Fricke spoke of Susan's anxiety attacks, his need to spend weekend golfing time with the children of his first marriage, Susan's distress when he took business trips, Susan striking him while he restrained her, "her life revolved around Alcoholics Anonymous, the kids, the cats, school, then me — in that order", his breakdown when Susan announced her intention to divorce, and his sense of having been betrayed.
Marriage, this court's calendar has repeatedly demonstrated, is, at best, a difficult relationship between imperfect beings. People do not enter into marriage in order to abuse their spouses or in order to commit adultery. But their actions and reactions can transform good intentions into poor behavior. Fault is most often bilateral, feeding one upon the other; balanced one by the other. Fault is generally a series of events, building upon its predecessors. It is rarely unilateral, rarely springing full blown from a single malicious spouse. As with the Frickes, fault is more often an atmosphere rather than any single event.
Had they better understood that the court is not lightly given to assigning fault, except in the most clear of circumstances, and has no instrument for mathematically quantifying degrees of fault, the Frickes' particularly Mr. Fricke, might have avoided the pain and the expense of the extended fault focused trial.
Having reviewed the evidence and the sworn financial affidavits of each party in the context of the required CT Page 1202 considerations set forth in Title 46b, Chapter 815j of the Connecticut General Statutes, a finding shall enter that the marriage has broken down irretrievable, a decree of dissolution shall enter and the following orders are entered:
1. CUSTODY
The parties are granted joint legal custody of the minor children. Primary physical custody shall be with the plaintiff mother.
2. ACCESS
The defendant father shall have access to both of the minor children, who are not to be separated from one another except with their express approval and the express approval of their mother, at follows:
a. Alternate weekends from Fridays at 5 P.M. to Sundays at 7 P.M. and such additional weekday or weeknight periods as the parties may mutually agree.
b. The children shall be with the plaintiff on her birthday and Mother's Day and with the defendant on his birthday and Father's Day.
c. The parties shall alternate Thanksgiving (beginning Wednesday at 6 P.M. through Friday at 8 P.M.), Christmas Eve (5 P.M. through 9 P.M.) and Christmas Day (9 A.M. through 8 P.M.).
d. One uninterrupted week, Saturday through Saturday, of defendant's choice between June 30 and Labor Day. Defendant to notify plaintiff at least sixty days in advance thereof.
e. If either parent moves a distance of greater than 150 miles from the Greater Hartford area, defendant's visitation shall be as follows:
 (i) alternating Thanksgiving (Wednesday at 6 P.M. through Sunday at 8 P.M.) and Christmas (December 24 at 6 P.M. through December 28 at 8 P.M.).
 (ii) children shall reside with defendant for two uninterrupted weeks. Saturday through Saturday, between June 30 and Labor Day. Defendant to notify plaintiff at least sixty days in advance thereof.
 (iii) Additional access between defendant and the children as the parties may mutually agree.
CT Page 1203
f. Neither party shall seek to change the residence of either minor child beyond 150 miles of the Greater Hartford area without giving the other party at least 90 days written notice.
3. SUPPORT
Defendant shall pay plaintiff child support of $100 a week for the minor child Elizabeth and $350 a week for the minor child Ashley.
4. TAX EXEMPTION
Defendant should be entitled to claim the minor children for income tax purposes provided he is current in all his payments and obligations set forth in these orders. Plaintiff shall provide defendant an executed Dependency Waiver for for each such year.
5. MEDICAL INSURANCE
a. Defendant shall continue coverage for the minor children on the health insurance policy provided by his employer for too long as they are eligible for such coverage.
b. Any unreimbursed expenses for medical, dental, optical, orthodontic, psychological, psychiatric, prescription drugs, nursing care or other health care for the minor children shall be shared equally by plaintiff and defendant.
c. The provisions of Section 46b-84c of the Connecticut General Statutes shall apply.
6. PERIODIC ALIMONY
a. Defendant shall pay plaintiff $250 a week through the month of August 1991, or until the closing date of the sale of the marital premises, whichever shall first occur. This reduced order reflects the court's recognition of the high cost of maintaining the family home and the court's limited patience with retaining ownership thereof.
b. Thereafter, defendant shall pay plaintiff $400 a week, assisting plaintiff to pursue a master's degree and the enhanced earning potential represented by that degree, a degree she estimates will require three or four years to earn. The $400 weekly payment shall cease after four years of $400 weekly payments or ninety days after plaintiff earns a masters degree, whichever first occurs.
c. Thereafter, reflecting plaintiff's new earning potential CT Page 1204 or the opportunity made available to her through the terms of this judgment to achieve such an earning potential, defendant's periodic alimony payment to plaintiff shall return to $250 week for a total period of ten years of periodic alimony payments following the date of dissolution or until plaintiff's remarriage or the death of either party, whichever shall first occur.
7. SUPPORT AND ALIMONY COLA
a. Child support and periodic alimony payments shall be automatically increased on a weekly basis by a cost of living adjustment calculated each calendar year. The adjustment shall be the percent of increase in the consumer price index for the prior year as determined by the United States Department of Labor.
b. Such cost of living adjustments shall be limited each years however, by the percent of increase for each individual calendar year in defendant's annual net income, calculated by deducting income and social security taxes from his wages and all other income resulting from his labor, whether paid in cash or in kind.
8. WAGE EXECUTION
An automatic wage execution shall enter unless the full amount of each alimony payment and each child support payment is electronically transfered directly to plaintiff's checking account and arrives in a timely manner.
9. LIFE INSURANCE
a. Defendant shall maintain life insurance of $150,000 on his life and shall name plaintiff as the irrevocable beneficiary thereof throughout the period she is receiving periodic alimony.
b. Defendant shall maintain life insurance of $142,000 on his life and shall name Elizabeth and Ashley, as irrevocable beneficiaries thereof during their minority. Their status as beneficiaries thereafter shall be in Noel Fricke's discretion.
c. Upon plaintiff's request, defendant shall provide annual certification or other documentation satisfactory to plaintiff attesting that said policies are in full force and effect.
10. MARITAL PREMISES
a. The parties' home at 50 Fox Den Road. West Simsbury, Connecticut, shall be sold. The parties shall divide the equity in CT Page 1205 home 55% to plaintiff and 45% to defendant, after first deducting any real estate commission incurred, the mortgage balances and the routine closing costs.
b. Should the sales price be insufficient to satisfy existing encumbrances and costs associated with the sale, defendant shall be responsible for paying the first ten thousand dollars ($10,000) of said excess encumbrances and costs. Thereafter, the parties will divide such excesses equally.
11. UTC PENSION
a. Noel Fricke began his employment at UTC on October 11, 1965. It continues to this date. The parties were married February 29, 1972. The parties agree that the retirement pension is now $3001 a month. Defendant shall transfer to plaintiff, by way of a qualified Domestic Relations Orders, 60% of 19/25ths of said $3001, or $1368.46 a month. It is understood that plaintiff is unlikely to enjoy the full benefit of the $1368.46 after it has been recalculated by UTC to reflect her age, ten years younger than defendant's.
b. The Qualified Domestic Relations Order shall be in the form attached hereto which may be varied to enable the parties, if they are in concert, to reflect the terms of the United Technology Corporation's pension plan.
c. The court is assigning Susan Fricke a 60% interest in the marital portion of Noel Fricke's UTC pension plan in on effort to afford Susan an opportunity to achieve a degree of dignity in her retirement years. The portion she has been awarded totals 45.6% of the existing pension. In addition to his 54.4% balance in the UTC pension, Noel Fricke is likely to be afforded a continuing high level of UTC employment and a continuing opportunity to enhance his retirement program in the years to come. Susan Fricke has not yet begun a career. At age 44 she faces approximately four years of schooling. Her pension potential is unknown and certainly limited. If she exercises restraint, avoids withdrawals, and allots this pension to grow, her benefits could be substantial.
12. PERSONAL PROPERTY
a. Plaintiff shall receive the contents of the attic (described by Susan Fricke as "mostly odds and ends from my mother"), plaintiffs remaining clothes, the childrens remaining clothes. The sewing machine, piano music belonging to plaintiff, plaintiff's mother and their daughter Elizabeth, and the ping-pong table. From among those items discussed with the court, defendant shall receive the pool table and the dining room CT Page 1206 hutch.
b. Defendant shall transfer his interest in the 1987 Audi Quatro 4000 to plaintiff free and clear of all liens. Plaintiff shall be responsible for maintenance, repairs and all other costs associated with said vehicle from the date of transfer.
c. Defendant shall retain his UTC savings plan and his UTC shares of stock.
13. COUNSEL FEES
After consideration of Section 46b-62 and 46b-82 of the Connecticut General Statutes and the respective financial abilities of each of the parties, this court concludes that each of the parties should pay their own attorneys' fees.
14. TAX RETURNS
If defendant makes a formal written request to plaintiff, plaintiff and defendant shall file joint federal and state income tax returns for the calendar year 1990, plaintiff to receive any refund to which she would have been entitled had she filed separately, plaintiff and defendant to share any joint return refunds equally, and defendant to assume full responsibility for any moneys due on those joint returns.
The foregoing orders with respect to custody and visitation shall stand and operate as interim orders of the court during the pendency of any appeal.
The court wishes to express its appreciation for the dignity and professional skills of Attorneys Glen Coe and David J. Elliott. They served their clients well.
JOSEPH L. STEINBERG, Judge